(C.D. 3950)

JAMES G. WILEY  
BIG BOY MFG. CO. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 31, 1969)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Owen J. Rader* and *Andrew P. Vance*, trial attorneys), for the defendant.

Before Rao and Ford, Judges, and Donlon, Senior Judge

Donlon, Judge: These two protests were consolidated for purposes of trial. The merchandise, in both cases, consists of articles imported from Japan. While the entry papers were not offered in evidence, testimony adduced on trial identifies the entry merchandise as motors with gears. There is in evidence a motor representative of the merchandise at bar, and the gear in the motor is evident.

The protested classification was under paragraph 353, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (T.D. 52739), with duty at 13¾ percent. Although plaintiffs have asserted, both on trial and in their brief, that defendant neglected to state whether classification was as "other" articles having as an essential feature an electrical element or device, or as parts of such articles, we find no merit in that contention. The

reports of the collector at Los Angeles, form 4297, of record in each case (although not timely filed) clearly state that classification was as *articles* having as an essential feature an electrical element, wholly or in chief value of metal, nspf., *other*. In view of this statement, we give no consideration to plaintiffs' elaborate argument that, absent such statement, the statutory presumption of correctness does not attach to the collector's classification. There is no ambiguity as to the classification in liquidation. The presumption attaches.

In addition to *ad valorem* duty at the rate of 13¾ percent, plaintiffs also were assessed internal revenue tax of 0.32 cent per pound, under section 4541(3) of the Internal Revenue Code, on the copper content of the merchandise. The internal revenue tax was not protested; it is not in issue.

The protests as originally filed claimed duty at 10½ percent under paragraph 353 (classification not stated). When the cases came on for trial, plaintiffs amended their protests to claim additionally, and alternatively, duty at the rate of 12½ percent either under paragraph 397 or under paragraph 353. Claims based solely on duty rate under a stated paragraph that has many tariff classifications and has several times been modified, without identifying the asserted tariff classification, do not comply with the requirements of section 514. They are insufficient to inform the court and the defendant as to the issues on which plaintiffs base their complaint and petition the court for adjudication of their alleged grievance in the liquidation. However, defendant did not move to have the protests dismissed for insufficiency and has submitted for our decision. Therefore, we now proceed to consideration of plaintiffs' case on the merits, in the light of the evidence that was adduced on trial.

It appears from the briefs that the particular tariff provisions which the parties assert are the following:

Paragraph 353, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (T.D. 52739):

> Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

| | |
|---|---|
| \* \* \* \* \* \* \* | |
| Electric motors, furnaces, heaters and ovens _____ | 12½% ad val. |
| \* \* \* \* \* \* \* | |
| Other (except \* \* \* cooking stoves and ranges; \* \* \*) _____ | 13¾% ad val. |

| | |
|---|---|
| Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof) _____ | The same rate of duty as the articles of which they are parts. |

Paragraph 353, Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108):

> Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

> > \* \* \* \* \* \* \*

> Motors:
> > Of more than 1/10 horsepower but less than 200 horsepower_____ 10½% ad val.
> > Other _____ 12½% ad val.

Paragraph 397, Tariff Act of 1930, as modified by the Torquay Protocol, *supra* (T.D. 52739):

> Articles or wares not specially provided for, whether partly or wholly manufactured:

> > \* \* \* \* \* \* \*

> Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other base metal, but not plated with platinum, gold, or silver, or colored with gold lacquer:

> > \* \* \* \* \* \* \*

> All the following, if not wholly or in chief value of lead, tin, or tin plate:

> > \* \* \* \* \* \* \*

> Cooking and heating stoves of the household type (not including portable stoves designed to be operated by compressed air and kerosene or gasoline), and parts thereof _____ 12½% ad val.

Mr. Bud Nakamura, a customs commodity specialist at Los Angeles whose assigned line of merchandise includes electric motors, testified that although he did not have the merchandise at bar before him (his position as customs commodity specialist being more recent than these importations), he had had motors such as those at bar before him for

advisory classification and he had advisorily classified them, if without gears, as electric motors, and with gears as "parts of whatever it is designated for."

The national sales manager of plaintiff Big Boy Manufacturing Co., Mr. E. W. Busby, also testified. In brief, the gear motors at bar were imported to be sold with certain portable barbecues "for patios and outdoor living" which Big Boy manufactures and sells from coast to coast. These are the several styles of Big Boy barbecues manufactured with spits for roasting meats. Four styles of barbecues manufactured by Big Boy, called picnic barbecues, do not have spits or motors. The barbecues with motors are used in "the back yard mostly." (R. 15.) The picnic barbecues are used, as the name implies, in places where picnics are held. There is no issue before us as to the flat top grill, spit-less, motor-less picnic barbecues.

The function of the motor, in conjunction with the spit, is to turn the spit a regulated number of rotations per minute. The gear is designed for a low rotation rate, and this is so in order that the meat may be continuously basted, automatically, as it cooks, avoiding the risk (inherent in a higher rotation rate) of spattering grease into the fire below. While the motor is not permanently affixed, it is inserted in a slot in the spit arm, and is advertised and sold as a feature of all the Big Boy barbecues that have spits.

Plaintiffs rely, first, on their contention that these barbecue grills with spits and motors are cooking stoves of the household type, within the above cited paragraph 397 enumeration, and that the motors are parts of such stoves. Citing *D. E. Sanford Company* v. *United States*, 43 Cust. Ct. 296, Abstract 63217 (1959), as authority, plaintiffs argue that the proofs of record here show that the grills in question, with spits driven by electric motors, are used chiefly for cooking in or near the house, where electricity is available, and hence are stoves of the household type.

While we have here no issue as to dutiable classification of the barbecues, being articles of domestic manufacture, it is necessary for us, nonetheless, to address ourselves to the question whether they are cooking stoves of the household type, enumerated in paragraph 397, as modified, by way of preliminary to our deciding whether the imported motors are, for tariff purposes, parts of such stoves.

Some thirty years ago the court considered, and so far as research discloses for the first time, articles imported from Japan and designed and used for cooking, with charcoal as fuel, usually in homes, patios and yards. The court held these were cooking stoves of the household type. *K. Samura Shoten* v. *United States*, 2 Cust. Ct. 45, C.D. 84 (1939).

To like effect is the decision in *Sanford, supra*, where the stoves at bar were portable hibachis.

In *Stor-All Corp.* v. *United States*, 48 Cust. Ct. 412, Abstract 66689 (1962), the merchandise at bar consisted of various articles imported, as plaintiff averred, to be used as essential parts in the manufacture of portable outdoor barbecue grills. There was no evidence that these grills were ever used within the house. Some of the grills were motorized. The motorized barbecue had an electric motor which turned the spit. The spit there, as here, could also be operated by hand "by merely removing the motor, which requires the unscrewing of a couple of nuts which attach the motor to the barbecue when there is a power failure, or no source of electricity to operate the spit, such as in summer cabins and remote country areas." (Pp. 413, 414.)

Writing for the court, Judge (now Chief Judge) Rao cited the holding in *Shoten, supra*, that the fact that the stoves burn charcoal and therefore are chiefly used for cooking out-of-doors in yards and gardens of homes, does not change their character as stoves of the household type.

Plaintiffs' witness, Mr. Busby, testified that he had read the opinion of this court in the *Stor-All* case; that he knew *Stor-All* as a competitor and was acquainted with its barbecue grills; that the electric motorized grills with spits, before the court in *Stor-All*, were similar to the *Big Boy* electric motorized grills with spits; that the only difference was in the way they mounted the motors. As the court found in *Stor-All*, the motors there could be removed by "unscrewing a couple of nuts"; here, the motor can be removed by sliding it out of a groove, or slit, in which the motor fits.

We are not impressed with the notion, advanced by defendant, that this difference in attachment is significant. In both cases the motor is readily detachable.

The spits, which were turned by electric motors, were held in *Stor-All* to be parts of cooking stoves of the household type. Here, however, defendant argues that the decision in *Stor-All* rested upon the particular facts presented there and that the record which plaintiffs here have adduced is not sufficient to establish chief use as a cooking stove of the household type. What defendant appears to question is whether the record sufficiently establishes chief use as a cooking stove *of the household type*. Chief use, indeed sole use, as a cooking stove is established.

The test of what the record should show was stated by our appeals court in *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953), as follows:

> While judicial notice may be taken of well known uses of an article, chief use is a question of actual fact which, in a case of this

character, should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. In other words, we are reluctant to disturb the presumption of correctness attaching to the collector's classification in the absence of unequivocal proof successfully contradicting the validity of such classification.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

While we accept the issue of chief use of the merchandise in question as controlling in this case and agree with the able discussion of that subject by the trial court, we feel constrained to interject this comment. Candelabra and candlesticks are of quite common use. They are, as such, used in many varied ways, well known by most everyone. It is tempting, therefore, for us to apply our judicial knowledge on the subject and once and for all determine the classification of such articles for tariff purposes in the future. We recognize, however, that despite what may be the experience and knowledge of one judge or another, such may not be in line with the chief use as determined via proof, which seems to us must be available in quantity and quality sufficient to assist the court in future litigation. It is to be regretted that the record in the case before us is not in that category. We find it almost totally unacceptable for such purposes. [Pp. 164, 165.]

Judged by this standard, what does the record before us show? Barbecue grills are of quite common use, but we do not decide chief use on the basis of judicial notice. The positive testimony before us is that the barbecue at bar is a meat cooking device "that you use in the back yard or patio." However, as to actual use personally observed, the record is explicit only as to the fact that Mr. Busby saw barbecue grills being used in demonstrations in named stores throughout the United States. Store demonstration cooking is, of course, not household cooking. As to household use which he had personally observed, the record is as follows:

"A. * * * also different homes I visit, or organizations, they would be cooking with it.

Q. Have you actually seen people cooking on these stoves?— A. Yes.

Q. I am referring to the stoves that you use the electric motor with.—A. That is correct.

Q. And where are those stoves used?—A. In the back yard mostly." [R. 15.]

Where these homes were, or in how many he had observed the motorized barbecue used to cook in home premises, the witness did not say. We do not substitute judicial notice for the evidence which the doctrine of chief use requires. As our appeals court observed in *Tobert, supra*, it is to be regretted that the record before us is almost totally unacceptable for the purpose of presenting proof in quantity

and quality sufficient to assist the court in determining the classification of such motorized barbecue grills for tariff purposes in the future.

As to the alternative claim that classification should be under modified paragraph 353 as an electric motor (of less than 1/10 horsepower), the record shows that the article at bar is a motor plus gear. The gear has a significant purpose for its intended use, namely, to produce rotation and to reduce the speed of rotation.

In *United States* v. *The A. W. Fenton Company, Inc.*, 49 CCPA 45, C.A.D. 794 (1962), the articles at bar were invoiced as "Hoover Electric Motor and Gear Assemblies." In reversing the decision of this court, our appeals court said:

> It seems to us the Customs Court erred as a result of treating the features which the article includes, in addition to the essentials set out in the definition of an electric motor, as doing no more than transforming the article into a gear motor or special purpose motor.

> The article does include a motor. It also includes gears and it clearly is designed for a special purpose. But the additional features it includes do more than make it a special type of motor. They dedicate it to one particular use as a part of a floor polisher. Since it is more than a motor, it is not properly classifiable as a motor for tariff purposes. It seems to us that to hold otherwise would be to expand by degree the term "motor" to a point beyond the accepted definition of that term. It would be difficult to find a stopping point. [P. 49.]

In *Servo-Tek Products Co., Inc.* v. *United States*, 61 Cust. Ct. 224, C.D. 3581 (1968); affirmed 57 CCPA—, C.A.D. 969; Judge Ford, after reviewing lexicographic definitions of "motor" and of "gear", said:

> From these definitions, it appears that it is the function of a motor to convert electrical energy into mechanical energy and that it is the function of a series of gears to transmit motion or change speed or direction. Here both of these functions are done by a single unit. * * * [P. 230.]

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> In the instant case also the article has the essential elements of a motor but includes features not essential to its function as a motor. The gear train has an additional function—to reduce the speed and increase the torque. It is attached to but not integrated in the motor. [P. 232.]

Discussing *Gamble Vargish & Co., dba Seabury & Co.* v. *United States*, 57 Cust. Ct. 448, C.D. 2834 (1966), in which the gear was found to be an insignificant part of the assembly, and distinguishing its facts from those in *Fenton, supra,* the court in the *Servo-Tek* case held that

while the motor and gear assembly there at bar did not have as many features in addition to the motor as were involved in the *Fenton* case, it did include more than a motor proper with an insignificant incidental feature, such as was involved in the *Gamble Vargish* case.

We find here too, that the assembly at bar includes, in addition to the motor proper, a gear which is a significant feature of the assembly.

Plaintiffs have not only failed to overcome the presumption that the liquidated classification was correct; they also have failed to establish by competent proofs either of their claimed classifications.

Judgment will be entered overruling the protest claims.